MERCHANTS' ICE CO. v. SCOTT & DODSON. (No. 5604.) *

(Court of Civil Appeals of Texas. San Antonio. April 26, 1916. Rehearing Denied May 31, 1916.)

1. ATTORNEY AND CLIENT ⬸165 — ACTIONS FOR COMPENSATION — SUFFICIENCY OF COMPLAINT.

A petition in an action by plaintiff to recover attorney fees from a corporation in which he was a stockholder, *held* to state a cause of action.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 365–367; Dec. Dig. ⬸165.]

2. CORPORATIONS ⬸177 — OFFICERS AND AGENTS — COMPENSATION FOR ATTORNEY'S FEES.

That an attorney is an officer or stockholder of a corporation does not preclude him from recovering the value of professional services rendered the corporation outside the scope of his duty as such officer or stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 653; Dec. Dig. ⬸177.]

3. CORPORATIONS ⬸425(5)—LIABILITY FOR UNAUTHORIZED ACTS—ESTOPPEL.

Express assent by corporation shareholders to unauthorized acts of its president is not necessary to bind the corporation which may be estopped to deny the unauthorized acts by failure to promptly condemn them and seek judicial redress.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1700; Dec. Dig. ⬸425(5).]

4. CORPORATIONS ⬸426(10)—LIABILITY FOR UNAUTHORIZED ACTS—ACCEPTANCE OF BENEFITS.

A corporation which accepts the benefits of unauthorized employment of counsel by its president is estopped to deny the authority of the president to make such contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1702, 1704, 1714; Dec. Dig. ⬸426(10).]

5. ATTORNEY AND CLIENT ⬸166(1), 167(2)—TRIAL—EVIDENCE—JURY QUESTION.

In an action by plaintiff to recover attorney fees from a corporation in which he was a stock-

holder, evidence *held* not to require a directed verdict for defendant, but on the contrary to sufficiently support verdict for defendant.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 368, 374; Dec. Dig. ⬸166(1), 167(2).]

6. TRIAL ⬸232(2) — INSTRUCTIONS — SPECIAL FINDINGS.

Under Rev. St. 1911, art. 1985, providing that a special verdict must find the facts and not the evidence establishing such facts, an instruction requiring the jury to state specifically upon what evidence it based its findings should be refused.

[Ed. Note.—For other cases, see Trial, Dec. Dig. ⬸232(2).]

7. TRIAL ⬸261— INSTRUCTIONS — REQUESTS EN MASSE.

Instructions requested en masse should be refused if any one of them is improper or has been substantially given in the main charge.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 484, 660, 671, 673, 675; Dec. Dig. ⬸261.]

8. EVIDENCE ⬸553(2)—HYPOTHETICAL QUESTIONS—FACTS INCLUDED.

A hypothetical question embracing counsel's theory of the case is not objectionable because it does not cover the full range of the evidence and embrace facts contended by opposing counsel to be established by the evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2370; Dec. Dig. ⬸553(2).]

9. ATTORNEY AND CLIENT ⬸167(2)—VALUE OF SERVICES—JURY QUESTION.

In an action for attorney fees, the value of the services rendered is peculiarly within the province of the jury.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 374; Dec. Dig. ⬸167(2).]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by Scott & Dodson against the Merchants' Ice Company. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Affirmed.

Denman, Franklin & McGown, of San Antonio, for appellant. John Sehorn, S. Engelking, and T. H. Ridgeway, all of San Antonio, for appellee.

SWEARINGEN, J. Appellees sued appellant, a corporation, to recover $7,800 for professional services rendered in behalf of appellant, and alleged in the alternative an express or an implied contract, or on a quantum meruit. Appellees alleged that the president of the corporation incurred the liability for attorneys' fees, and that all the stockholders concurred therein; that their services were necessary and resulted in substantial benefits to the corporation; that all the stockholders and the president accepted all the benefits for the corporation, with full knowledge of appellees' professional services, and this appropriation of the fruits of appellees' services was made with full knowledge of appellees' services and claims for compensation; and, further, that at the time of this appropriation appellees were neither stockholders, nor directors, nor otherwise connected with the company in any official capacity.

---

Appellant pleaded a general exception, that the petition was insufficient in law because no promise to pay, express or implied, was averred in such way as to render the appellant liable to appellees. After denying appellees' cause of action, appellant affirmatively answered that it paid appellees for all services rendered. That at the time the services were rendered appellees were officers and directors of the corporation, and it was their duty as such officers to render all the services for which compensation is claimed by appellees. Further, that appellees had claimed only $300 for professional services which appellant had paid. That the contract of employment, if any, was made by the board of directors, consisting of three members, of whom appellees were two. That such a contract so made was null and void.

After appellees had testified as witnesses at the trial, appellant filed a trial amendment, answering in effect that appellees' evidence showed that the liability for attorney's fees was contrary to public policy, and therefore void. At the close of appellee's testimony the case was submitted to a jury upon special issues. The jury rendered its verdict in favor of appellees for $6,500, upon which verdict, and law and facts found by the court, judgment was rendered for appellees. Appellant's amended motion for new trial was overruled.

[1] Appellant, in its first assignment, on page 6 of its brief, says the court erred in overruling the following exception:

"It generally and specially demurs and excepts to all of said petition and says that same is insufficient in law and shows no cause of action against this defendant, because no agreement or promise to pay, express or implied, is averred therein as made by this defendant in such way as to render this defendant liable unto plaintiffs, either upon a special contract of employment for attorney's fees or upon an implied contract of employment for attorney's fees."

This assignment is overruled, because we are of the opinion that the petition sufficiently alleged a legal cause of action.

Appellant's assignment numbered "5a" assigns that the trial court erred in its refusal to peremptorily instruct a verdict for the defendant (appellant) as requested, as follows:

"The court erred in refusing to submit to the jury special charge No. 1, asked by defendant prior to the submission of the cause, and to the refusal of the court to give said charge, defendant excepted at the time of such refusal and prior to the submission of the cause to the jury, viz.: 'The jury are instructed that there is no evidence in this case legally sufficient to support a verdict for plaintiffs, and you are therefore instructed to render your verdict herein in favor of defendant.'"

The assignment is submitted as the only proposition. Whether required by this proposition or not, we have made a very careful examination of the record evidence, and find therefrom the facts to be:

Appellees were experienced practicing lawyers, and were partners. On September 11, 1912, the stockholders of the Merchants' Ice Company met in room No. 316, Alamo Bank Bldg., San Antonio, Tex., at which all the stock of 1,400 shares was voted, and resolved to execute bonds for an amount not to exceed $150,000, and to secure payment of same to execute a deed of trust on all its property. The stockholders present in person or by proxy were the following: Adam Vogt, in person; E. H. Wedekind, in person; George B. Marshall, in person; C. W. Fichtner, in person; J. H. Kirkpatrick, by proxy; Henry Vogt, by proxy; Soren Thurstensen, by proxy; W. S. Montz, by proxy; G. A. Heuser, by proxy; L. Wedekind, by proxy; George G. Montz, by proxy.

On the same day, September 11, 1912, the directors of the company held a meeting and resolved to execute the bonds for $150,000 and to secure the payment of same by executing a deed of trust upon all corporate rights, franchises, and physical properties of the corporation. The directors were E. H. Wedekind, Chairman, C. W. Fichtner, Adam Vogt, and Geo. B. Marshall.

On the 15th day of January, 1913, the Merchants' Ice Company, by E. H. Wedekind, vice president, executed the deed of trust, the Central Trust Company of San Antonio, Tex., being the trustee. The certificate of acknowledgment of the deed of trust was dated January 15, 1913. The deed of trust was filed for record in the deed of trust records of Bexar county, Tex., January 15, 1913.

On January 18, 1913, all the persons who owned stock on January 15, 1913, sold all their stock to Mr. Eugene Nolte and Chas. A. Zilker and to friends or associates of Nolte and Zilker, in the following proportions:

|  |  |  |  |
|---|---|---:|---|
|  | Eugene Nolte | 41 | per cent. |
|  | Postlewaite | 3.15 |  |
|  | Zilker | 22.75 |  |
|  | Cable | 10.5 |  |
| Mrs. | Castleman | 5.25 |  |
|  | Dodson | 10. |  |
|  | H. L. Guenther | 6.15 |  |
|  | Freeborn | 1.2 |  |
|  |  | 100 | per cent. |

The capital stock purchased was $140,000, though there was $20,000 unissued stock for which some of the selling stockholders had subscribed. Mr. Zilker was the experienced owner of ice companies, who, through agents, negotiated the purchase of the stock by himself and Nolte and their friends. Without money consideration Zilker transferred one share of stock to appellee Scott, who immediately indorsed and delivered the certificate to Zilker. Dodson borrowed the money for his stock from a bank, on a note signed by Zilker. Postlewaite, Freeborn, and H. L. Guenther were associated with Zilker in other ice plants. Zilker represented Cable and Mrs. Castleman.

The price paid by the buyers for the $140,-000 stock to the selling stockholders was

$50,000 cash. The sellers represented to the buyers that the value of the property of the corporation was $200,000, and that its annual net earnings had been and were at the date of sale $40,000, and to verify the statement of value and earning capacity promised to furnish the books of the corporation. The domicile of the corporation was San Antonio, Tex., and the books should have been in San Antonio, Tex.

The $140,000 stock was duly transferred by sellers to buyers on January 18, 1913, the $50,000 was paid to the sellers, and the sellers retained the $150,000 bonds, secured by the deed of trust on the corporation's property. After the transfer of the stock to Nolte and Zilker, and their friends, Nolte was duly elected president of the corporation, and he, Scott, and Dodson were elected directors. The new stockholders demanded the books of the corporation from the selling stockholders after discovering that the books had been removed from the company's office. The selling stockholders had removed the books to Louisville, Ky. The sellers finally replied to the buyers that the books could not be produced and furnished; that the books had been burned in Louisville, Ky. The corporation then found it necessary to employ an expert to appraise the value of the property of the corporation in order to know its real value. The expert appraised the property at much less than $200,000, viz., not over $149,963 when built. The outstanding stock and bonds amounted to $290,000.

At this stage of matters, which was after January 18, 1913, all the stockholders were gotten together. Besides appellees, there were present Nolte, Postlewaite, and Zilker, and all the others were represented at the meeting by Mr. Zilker. At this meeting of all the stockholders it was determined that the company must have lawyers and legal advice to safeguard the company. Mr. Nolte, the president of the company, at this meeting, and also Mr. Zilker told appellees to go to work, to go ahead and represent the company in a legal capacity and protect the company, so that the amount of the indebtedness represented by the bonds in the hands of the sellers could be reduced in the same ratio that the real value of the property bore to the misrepresented value. The represented value was $200,000, the real value was $115,566 at the time of appraisement, several days after the trade, though the expert was of the opinion that the property when new had been worth $149,963.

Nolte, the president, at the meeting of all the stockholders, those not present in person being represented by Zilker, said to appellees:

"That is up to you boys; go ahead and take care of that. * * * Get the petition ready and prepare to file that suit."

Appellees proceeded to prepare for the legal steps.

On February 17, 1913, a directors' meeting passed a resolution, the purport of which was to repudiate the bonds and deed of trust because of the fraud on the part of the sellers, made apparent by the discovery that the real value of the corporation was much less than the misrepresented value. This resolution was suggested by appellees in pursuance of their previous employment as lawyers to protect the company with their legal services.

Appellees, after February 17, 1913, proceeded to thoroughly prepare the law and evidence as they had been employed and instructed to do by the president in the presence of all the stockholders. After investigating, as attorneys, appellees told all the stockholders assembled, Nolte, Postlewaite, appellees, and Zilker being present in person, and all the other stockholders being represented, that they had reconsidered the question of filing suit for the corporation, to cancel the bonds, though the petition was prepared and everything was ready to file the suit. Appellees advised waiting for the bondholders, who were the sellers, to sue the corporation to enforce payment of the interest on the bonds and then answering that suit, to foreclose the deed of trust for $150,000 and interest, by setting up the fraud of the selling stockholders in overvaluing the property. Appellees then exhaustively prepared to defend such a suit. The president, Nolte, at this meeting was solicitous about the probability of a receivership of the corporation in the event suit was filed for default of interest. Appellees, as attorneys, investigated the law bearing upon this question, suggested by Mr. Nolte, the president.

The stockholders rested the entire responsibility of the legal situation upon appellees as attorneys. From February until November, 1913, appellees, under instructions from the president, Mr. Nolte, and with the acquiescence of all the other stockholders, gave practically the entire time of appellee Dodson to the preparation of the law and facts for the corporation in its expected suit for foreclosure of the $150,000 bonded indebtedness.

The president of the corporation, Mr. Nolte, wanted a clear understanding of the cost for the legal services of appellees, for their employment to protect the corporation in the matter of the fraudulent valuation by the sellers, and said to appellees that certainly he understood that appellees were to be paid for legal services, such as defending the expected suit for foreclosure, which was expressly mentioned. It is true that the president, Mr. Nolte, consulted Judge Denman and expressed himself as uneasy about the result of the foreclosure suit. At the instance of Mr. Nolte, appellees consulted with Judge Denman in the presence of President Nolte and Mr. Zilker, and gave Judge Denman the views of appellees and also furnished authorities to Judge Denman. The president, Mr. Nolte, notwithstanding the counsel of appellees, expressed his belief that the suit could

not be successfully defended by the corporation.

About the middle of July, 1913, the first interest coupons became due. The coupons reached San Antonio. Different banks presented the coupons to the corporation for payment. Appellee Dodson got President Nolte, Zilker, and the stockholders together, and notified them to decide whether to pay the interest or face the suit for foreclosure. At a meeting, Nolte, the president, said he was sure he could not reduce the bonds in the suit. Zilker replied that Nolte had "cold feet." Appellees were instructed by Nolte, Postlewaite, and Zilker to turn down the payment of the coupons. Payment of coupons was refused. Appellees then proceeded with preparation for the impending suit.

Appellees discussed, after this, with Mr. Nolte, the president of the company, and also with Zilker and Postlewaite, the compensation appellees would receive from the corporation for legal services necessary for defense of the foreclosure suit, and requested an agreement. The president, Mr. Nolte, and Zilker and Postlewaite said the corporation would pay liberally if they got it out of the bondholders. Next in order of time came letters from the bondholders and a letter from Judge Clamp, of San Antonio, Tex., dated July 28, 1913, advising the Merchants' Ice Company that if interest coupon was not paid within 60 days suit would be filed for the entire amount of the bonds to enforce payment. After receipt of the foregoing notices, Zilker told appellees he thought Nolte, the president, had already agreed upon the compensation to be paid to appellees for their legal services incident to the threatened foreclosure suit. Appellees replied that the amount of the compensation had not been definitely agreed upon. Zilker replied that he would see Nolte and send him up to appellees, and that Nolte would agree upon the amount of the compensation. The next morning, following this conversation, Nolte, the president, went to the office of appellees and told them that he was willing and to continue with their legal services in connection with the foreclosure suit. Appellees retained all papers in connection with this matter, which they had on this occasion tendered in one bundle to Mr. Nolte and which he had declined to receive. Appellees continued their work as attorneys for the corporation on the threatened foreclosure suit.

Shortly after the expiration of the 60 days mentioned in notices from the bondholders, the bondholders suggested a conference looking to a compromise. Representatives of the bondholders came to San Antonio and met the president, Mr. Nolte, Mr. Zilker, and appellees. Appellee Dodson was selected to personally conduct the compromise negotiations for the corporation, which, after many meetings and great haggling through several days, resulted in a reduction by the bondholders of $39,000 from the amount of the bonded

indebtedness. The reduced indebtedness was novated, the form of the evidence of indebtedness and the deed of trust securing the indebtedness were all recast in different form. After the reduction of $39,000 had been agreed upon by the president, Mr. Nolte, Mr. Zilker, and the other stockholders present or represented, appellees asked Mr. Nolte what arrangements the corporation would make for the payment of appellees' fee for legal services in this matter, and were informed for the first time by the president, Mr. Nolte, that nothing would be paid to them. Appellees replied they certainly expected to be paid for their professional services in this case. Appellee Dodson promptly sold the stock in his name. Appellee Scott had disposed of the stock in his name immediately upon receipt of it.

On January 2, 1914, all the stockholders of the Merchants' Ice Company (appellees were not stockholders not in any way connected with the company) held a formal stockholders' meeting, whereupon all the stockholders appeared and participated in said meeting, either in person or by proxy, and proceeded to officially carry into effect the agreement effected through the professional services of appellees. And to that end, after noting the resignations of appellees, which were of record, and electing James T. Holmes and Walter Nolte as directors in the place of appellees, Scott and Dodson, and after the new directors qualified, there was a joint meeting of all the stockholders and all the directors, who thereupon, by appropriate resolution, completed the said compromise agreement, by which the corporation saved the $39,000, brought about by the said professional services of appellees. It will be remembered that neither of the appellees was either a stockholder in or a director of the corporation at the date of this joint meeting held January 2, 1914.

The real value of the property of the corporation was approximately $150,000. Expert witnesses testified that the professional services of appellees rendered on behalf of the corporation in the matter of the foreclosure suit were reasonably worth from $5,000 to $10,000. The jury found the value of same to be $6,500.

The principles of law applicable to the facts of the case at bar have been so often and so ably stated that we feel it unnecessary to do more than briefly refer to them:

[2] (a) " * * * An attorney who is also director, secretary, and treasurer of a corporation may recover the value of his special personal services rendered it strictly in the line of his profession and entirely outside the scope of any of his official duties, if such services were rendered under such circumstances as to raise a fair presumption that the parties intended and understood they were to be paid for, or ought to have so intended and understood." 7 R. C. L. p. 465; Taussig v. St. Louis R. Co., 166 Mo. 28, 65 S.

W. 969, 89 Am. St. Rep. 674; Bankers' Trust Company v. Cooper, Merrill & Lumpkin, 179 S. W. 542; Cold Storage Company v. Crawford, 18 Tex. Civ. App. 180, 44 S. W. 875.

[3] (b) "An express assent * * * is not essential on the part of the stockholders to operate as an equitable estoppel upon them. It may be inferred from the failure to promptly condemn the unauthorized * * * act and to seek judicial redress." Ft. Worth Pub. Co. v. Hitson, 80 Tex. 228, 14 S. W. 846, 16 S. W. 551; Cold Storage Co. v. Crawford, 18 Tex. Civ. App. 180, 44 S. W. 875; Peach River Co. v. Ayers, 41 Tex. Civ. App. 334, 91 S. W. 387.

[4] (c) Where contract inures to benefit of corporation and corporation accepts the results thereof the corporation is estopped from denying that the president was duly authorized to make the contract. Bankers' Inv. Co. v. Cooper, Merrill & Lumpkin, 179 S. W. 542; Scott v. Nat. Bank, 97 Tex. 46, 53, 75 S. W. 7, 104 Am. St. Rep. 835.

[5] Appellant argued extensively eight reasons for the giving of the peremptory instruction, all of which have been studiously considered and carefully compared with the facts of the case at bar, with the result that we conclude that this assignment is not well taken and is overruled.

Appellant's assignments, numbered 2, 1, 4, 6, 13, 14, 15, 16, 17, 18, 20, 21, 11, and 19, presented in the order mentioned on pages of brief from 86 to 105, are all in violation of rule 29, provided by the Supreme Court for Courts of Civil Appeals, because the assignments are not numbered in consecutive order. Rule 29 (142 S. W. xii). In this connection, we call attention to the fact that there is a first assignment in appellant's brief on page 88, based on the third ground of appellant's motion for a new trial, and also a first assignment on page 6 of appellant's brief based on the first ground of appellant's motion for new trial. Grisham v. Connell Lumber Co., 164 S. W. 1107; Barron v. White, 155 S. W. 590; Taylor v. Butler, 168 S. W. 1004.

Furthermore, each assignment complains that the trial court erred in refusing various special issues and special instructions requested by appellant. From the record it appears that all of the issues and charges requested by appellant were contained en masse together with others, the refusal of which is not assigned as error. All were contained in one volume. The sheets consecutively numbered were securely branded together and bound in one wrapper. At the top of the front sheet was the style and number of the case and a designation of the court, after which followed the only request made in connection with said special issues and charges, as follows:

"Defendant asks the court to submit the following special issues to the jury with the charges accompanying same."

Following this, in due order, appeared the requested special issues and charges, each of which was preceded by its appropriate number or description, but without a preceding designation or description of the court or cause, and without signature of defendant or its attorneys except at the conclusion of the last requested issue, No. 11.

It further appears from the record that special requested issue No. 1 required the jury to collate evidence, and not find a fact as required by the statute, and the issue of fact was submitted in its main charge.

Special issue No. 2 was contained in the main charge.

[6] Special requested issue No. 9 required the jury to state specifically upon what evidence in the case it based its findings. This should have been refused. R. C. S. art. 1985; Selden-Breck Const. Co. v. Kelley, 168 S. W. 985; Guffey Petroleum Co. v. Dinwiddie, 168 S. W. 439.

[7] It is a well-settled rule that instructions requested en masse should be refused by the trial court if any one of them has been substantially given by the court in its main charge, or if any one of those requested en masse should have been refused. Hovey v. Sanders, 174 S. W. 1025; Longworth v. Stevens, 145 S. W. 259; I. & G. N. Ry. v. Neff, 26 S. W. 784; Yarborough v. Weaver, 6 Tex. Civ. App. 215, 25 S. W. 468. The trial court did not err in refusing to submit the special requested instructions contained en masse, and the foregoing assignments cannot be considered upon their merits.

[8] By assignments 22, 23, and 24 appellants claim it was error of the trial court in allowing a hypothetical question to be propounded to A. B. Storey, J. B. Lewright, and J. F. Ryan, experienced lawyers, and to permit witnesses to answer. The hypothetical question had been reduced to writing and was read to each of the witnesses. The question is very long and its insertion here would needlessly lengthen this opinion. Suffice it to say that the question embraced appellees' theory of the case and embraced the facts in evidence sufficiently to enable the jury to form an intelligent opinion of what experienced lawyers considered a proper fee under the facts pleaded and proven in this case. That it may not have covered the full range of the evidence did not render the question and answer inadmissible in evidence. "Counsel have the right to embody in their questions the facts which in their judgment the evidence proves, and are not compelled to embrace therein the facts that the opposing litigant contends to be those established by the evidence." Order of United Com. Trav. of Amer. v. Roth, 159 S. W. 179.

The twenty-fifth, twenty-sixth, and twenty-seventh assignments complain that the verdict of the jury in response to special issues 1, 2, and 3, respectively, is without any evidence to support it. We have already stated the facts in this case, in considering appellant's assignment No. 5a, and deem it un-

necessary to repeat our conclusion of facts. The evidence was uncontradicted, and ample to sustain the answer of the jury to each of the three special issues.

By assignments 28, 29, and 30 appellants complain that the verdict of the jury is contrary to the law and the evidence in answer to special issues Nos. 1, 2, and 3, respectively. What has been said of the facts in considering assignments 25, 26, and 27 applies with equal force to these assignments. Therefore assignments 25, 26, 27, 28, 29, and 30 are overruled.

[9] Appellant's thirty-first assignment complains that the verdict for $6,500 is excessive. The value of the professional services of appellees was peculiarly within the province of the jury. There was evidence to support their verdict. Assignment 31 is accordingly overruled.

The trial court did not err in entering the judgment upon the verdict as complained of in appellant's thirty-second assignment, and the same is hereby overruled.

Finding no error in the record presented in the numerous assignments of error of appellant, the judgment of the trial court should be and is affirmed.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.